**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DERRICK LEON JACKSON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-4083 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case is before the Court on Petitioner Derrick Leon Jackson's Petition for Writ of Habeas Corpus (Document No. 1), and Respondent Nathaniel Quarterman's Motion for Summary Judgment (Document No. 4).[1]  Having carefully considered the Petition, the Summary Judgment Motion, Petitioner's Response to Respondent's Motion for Summary Judgment, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and Jackson's Petition for Writ of Habeas Corpus should be DENIED.

---

[1] The named Respondent in the original pleadings was Quarterman's predecessor as Director of the Texas Department of Criminal Justice's ("TDCJ") Correctional Institutions Division, Doug Dretke.  Quarterman has since replaced Dretke, and is therefore substituted as the Respondent in this case.

## I.   Background

Petitioner, Derrick Leon Jackson, currently in the custody of the TDCJ, filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2254.  Because this is Jackson's first petition for federal habeas relief, a brief history of the case is appropriate.[2]

The victims, Forrest Henderson and Richard Wrotenberry, were singers in the Houston Grand Opera.  Shortly before his death, Henderson toured with the opera in Scotland.  Wrotenberry moved into Henderson's Houston apartment to housesit while Henderson was out of the country and continued to live in the apartment after Henderson returned.

David Trujillo lived next door to Henderson and Wrotenberry. At around 10:30 p.m. on September 10, 1988, Trujillo heard music and Henderson's voice through the common wall separating their apartments.  Trujillo went to sleep around 2:00 a.m. and was awakened at 4:45 a.m. by the sound of Wrotenberry screaming "Oh my God. No. No," several times.  Trujillo also heard what sounded like someone being hit numerous times with a pipe or a baseball bat. After 30 minutes of silence, he heard the water running for about 45 minutes.  Trujillo never heard Henderson's front door open or

---

[2] For the sake of convenience, this statement of facts is adopted largely from the Texas Court of Criminal Appeals' decision affirming Jackson's conviction and sentence.  *Jackson v. State*, 17 S.W.3d 664, 667-68 (Tex. Crim. App. 2000).  Any addition to or divergence from the Court of Criminal Appeals' decision will be noted by a specific citation to the record.

anyone leave.   A person could enter or leave Henderson's apartment *via* a separate stairwell, however, without having to pass by Trujillo's door.

Trujillo testified that he often saw "street trash" going in and out of Henderson's apartment before Wrotenberry moved in, that the apartment was a rowdy place, and that there was always some kind of screaming and fighting going on.   The rowdiness subsided after Wrotenberry moved in.

Besides singing in the opera, Wrotenberry also worked as a music teacher at Deer Park Elementary School.   On Monday, September 12, 1988, he failed to appear for work.   At 9:00 a.m., the school principal contacted Henderson's apartment manager to check on Wrotenberry.   The manager unlocked Henderson's apartment door and found nothing disturbed in the living room and kitchen.   He proceeded to one of the bedrooms, pushed open the door, and saw a body covered with blood. He promptly left and called 911.

Police officers arrived at the apartment soon thereafter and detected no signs of forced entry.   They found Henderson's and Wrotenberry's bodies in their respective bedrooms at opposite ends of the apartment.   Henderson's nude body was lying face-down in his bed, and Wrotenberry's body, clad only a pair of swimming trunks, was lying on the floor of his bedroom.   The absence of significant blood in the hallway connecting the two bedrooms indicated that neither victim left his room during or after the attacks.   Police

3

found a bloody metal bar in the hallway and a bloody knife in the kitchen sink.  Blood was all over the bedroom walls, doors, and curtains.  Both victims' wallets were missing, and Henderson's car was gone.  Two or three days later the car was recovered after a chase following a burglary at a mall, but the driver was not apprehended.  Apart from the burglary, police recovered no other evidence from the car.  21 Tr. at 194-95.[3]

A forensic pathologist testified that Alan Wrotenberry suffered a severed carotid artery, cuts to the vertebrae, and at least three blows to the back of the head with a narrow blunt instrument, such as a pipe.  Forrest Henderson received a shallow, non-fatal cut to the neck, defensive wounds on both arms, a six-inch fracture of the skull from blunt force, and multiple stab wounds to the torso.  Fixed lividity in both bodies signified that both victims were dead for more than eight hours before they were found.  Tests performed on both victims revealed no signs of drugs, alcohol, or semen.  Blood samples and 20 identifiable fingerprints were collected from the crime scene, but the Houston Police Department ("HPD") was unable to develop a suspect.

In 1995, HPD upgraded to a new fingerprint system with an expanded database.  The new system matched Jackson with prints lifted from a beer can and a glass tumbler in Henderson's bedroom.

---

[3] "Tr." refers to the transcript of Jackson's trial.

A bloody print found on Henderson's bedroom door also matched Jackson.  An expert in blood-spatter interpretation testified that the bloody fingerprint could have been formed only by touching a blood drop while the blood was still wet--as opposed to a blood drop landing on an old fingerprint.

An HPD serologist testified that type-B blood was found on a bedroom door.  Jackson is blood-type B; both victims were blood-type A.  Police found no other identifiable blood type sample at the crime scene.  The State's DNA expert testified that Jackson's DNA profile matched DNA isolated from blood stains on a red towel and a beige towel located in Henderson's bathroom.  The odds that another African-American would possess the same profile are one in 7.2 million.  The jury found Jackson guilty of capital murder for murdering more than one person during the same criminal transaction.

During the penalty phase, the State presented evidence that Jackson snatched a woman's purse in 1990.  25 Tr. at 17-30.  The State also presented evidence that Jackson robbed two other victims of their purses at gunpoint, id. at 31-64, and attempted to steal a car, id. at 84-101.

Alan Wrotenberry's father testified that Alan was a vivacious young man.  He played tennis and ping pong and was a fan of the Houston Astros and Rockets.  Alan was divorced and had a one-year-old daughter at the time of his death.  Alan was close with his

father, mother, and sister.  Mr. Wrotenberry testified that he and his family had difficulty coming to grips with the reality that Alan was dead, and have undergone counseling since Alan's death. Alan's sister was admitted to a psychiatric hospital following the murder.  Id. at 107-20.

Leroy Smith testified for Jackson.  Smith is a barber instructor for TDCJ.  Jackson was Smith's student and completed over 1,400 of the 1,500 hours required for completion of a barber training course at the time he was brought back to Houston for his capital murder trial.  Smith testified that Jackson was a good student who caused no problems and was respectful of TDCJ personnel and other inmates.  Smith never saw Jackson act violently or misuse any of the barber equipment.  Id. at 121-30.

Dr. Ann Carolyn Wheeler, a clinical psychologist, also testified for Jackson.  She performed a psychological evaluation of Jackson.  She testified that Jackson does well in a structured setting, such as prison.  He is unlikely to affiliate with a gang or engage in violence in prison.  Id. at 137-54.  On cross-examination, Dr. Wheeler conceded that Jackson's history of criminal conduct suggests that he is dangerous.  Id. at 200-16.

Jackson's mother, Rita Everline, testified that Jackson never knew his father because his father committed suicide.  Everline remarried when Jackson was nine months old.  Jackson has two younger half-brothers.  He was a normal child and got along well

6

with his brothers.  Jackson's stepfather had a drinking problem and sometimes he and Ms. Everline fought and she fled the house. Jackson did not have any unusual discipline problems at school. Id. at 228-43.  Jackson's stepfather agreed with Ms. Everline's testimony.  Id. at 244-49.

The jury found that Jackson deliberately committed actions that caused Alan Wrotenberry's death with the reasonable expectation that the death or Wrotenberry or another would result; that there is a probability that Jackson will commit criminal acts of violence that would constitute a continuing threat to society; and that there was not sufficient mitigating evidence to warrant a sentence of life imprisonment rather than death.   27 Tr. at 4-5. Accordingly, the trial court sentenced Jackson to death.   Id. at 7-8.

The Texas Court of Criminal Appeals affirmed Jackson's conviction and sentence, Jackson v. State, 17 S.W.3d 664 (Tex. Crim. App. 2000), and denied his application for a writ of habeas corpus, Ex Parte Jackson, No. 60,124-01 (Tex. Crim. App. Dec. 1, 2004).  Jackson filed this federal petition for habeas corpus on November 30, 2005, and Quarterman moved for summary judgment on April 13, 2006.  Jackson's petition is timely.

II.  Discussion

A.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  *See* Lindh v. Murphy, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Kitchens v. Johnson, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See* Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on

a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" Dowthitt v. Johnson, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362, 406 (2000)), *cert. denied*, 532 U.S. 915 (2001).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." Hoover v. Johnson, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub*

*nom.* <u>Neal v. Epps</u>, 537 U.S. 1104 (2003).  The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"  <u>Id</u>. (quoting <u>Hennon v. Cooper</u>, 109 F.3d 330, 335 (7th Cir. 1997)); *see also* <u>Gardner v. Johnson</u>, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also* <u>Jackson v. Anderson</u>, 112 F.3d 823, 824-25 (5th Cir. 1997) *cert. denied*, 522 U.S. 1119 (1998).

B.   <u>The Standard for Summary Judgment in Habeas Corpus Cases</u>

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." <u>Clark v. Johnson</u>, 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000).  Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases.  *See* Rule 11 of the Rules Governing Section 2254 Cases.  In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party.  *See* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  However, where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. <u>Marshall v. Lonberger</u>, 103 S. Ct. 843, 432 (1983); <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981); <u>May v. Collins</u>, 955 F.2d 299, 310 (5th Cir.), *cert. denied*, 504 U.S. 901 (1992); <u>Emery v. Johnson</u>, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998).  Consequently, where

11

facts have been determined by the Texas state courts, this Court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.


C.   Summary Judgment in the Instant Case

Jackson's petition raises five claims for relief.  These are addressed in turn.

1.   Sufficiency Of The Evidence

In his first claim for relief, Jackson contends that the evidence was insufficient to support his conviction.  In addressing a sufficiency of the evidence claim, "the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).  The sufficiency of evidence is a mixed question of law and fact.  *See* Gomez v. Acevedo, 106 F.3d 192, 198 (7th Cir.), *vacated on other grds.*, 522 U.S. 801 (1997).  Therefore, as noted above, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." Martin v. Cain, 246 F.3d 471, 475 (5th Cir. 2001).

Jackson argues that there were no eyewitnesses, no evidence of forced entry or a prior relationship between Jackson and the victims, and no motive.  He further argues that he was never found in possession of any property stolen from the apartment, and that he could have left his fingerprints at the scene at any time, not only at the time of the murders.  He also contends that the evidence was insufficient to demonstrate that both murders were committed during the same criminal transaction, a necessary element of the capital murder charge against him.

Jackson's argument ignores the fact that some of the fingerprints recovered from the crime scene were placed in the victims' blood, indicating that Jackson left the finger print while the blood was still wet.  This fact could reasonably be seen as placing Jackson at the crime scene at the time of the murders.  As the Texas Court of Criminal Appeals found:

> [Jackson]'s bloody fingerprint puts him in the apartment while the blood was still wet. Further, the discovery of blood consistent with [Jackson]'s DNA profile on the towels and on the bloody bar leads to the reasonable conclusion that [Jackson] was injured during the struggle with one or both of the victims.

Jackson v. State, 17 S.W.3d 664, 669 (Tex.Crim.App. 2000).  Viewed in the light most favorable to the State, a reasonable juror could have concluded from the bloody fingerprints and Jackson's DNA on the towels that Jackson was in the apartment at the time of the murders.

13

Jackson also argues that there was insufficient evidence to prove that both murders were committed during the same criminal transaction.   The Texas Court Of Criminal Appeals found that:

> [B]oth victims were killed in the same manner with the same weapons and were found dead in the same apartment. Although the medical examiner testified that only Henderson's body showed signs of decomposition, he maintained that he could not determine who was killed first. He explained that Henderson's struggle with the assailant could have caused increased secretion of acid in his system, thus accelerating decomposition. Based on our review of the record, we find that "the jury could rationally conclude appellant engaged in a continuous and uninterrupted process, over a short period of time, of carrying on or carrying out murder of more than one person.

Id.

To find that the murders were not committed within a short time span, the jury would have had to infer that the murderer, or a second murderer, entered the apartment after a significant time lapse and proceeded to use the same weapon to beat the second victim to death in the same manner as the first.   It was not unreasonable for the jury to decline to draw this inference.   The Texas Court Of Criminal Appeals's rejection of these claims was thus reasonable, and Jackson is not entitled to relief.

### 2.   Ineffective Assistance of Counsel

In his second claim for relief, Jackson argues that his trial counsel was ineffective for failing to present certain character

witnesses.    Jackson's  petition  identifies  six  witnesses  who,
Jackson  claims,  variously  would  have  testified  that  Jackson  is
nonviolent,  mild  mannered,  helpful  to  older  people,  and  came  to
work  on  time.

　　　　To  prevail  on  a  claim  for  ineffective  assistance  of  counsel,
Petitioner

> must show that . . . counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed
> by the Sixth Amendment.   Second, the [petitioner] must
> show  that  the  deficient  performance  prejudiced  the
> defense.   This  requires  showing  that  counsel's  errors
> were  so  serious  as  to  deprive  the  defendant  of  a  fair
> trial,  a  trial  whose  result  is  reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).   In order  to
prevail  on  the  first  prong  of  the  Strickland  test,  Petitioner  must
demonstrate  that  counsel's  representation  fell  below  an  objective
standard  of  reasonableness.    Id.  at  687-88.    Reasonableness  is
measured  against  prevailing  professional  norms,  and  must  be  viewed
under  the  totality  of  the  circumstances.    Id.  at  688.    Review  of
counsel's  performance  is  deferential.    Id.  at  689.

　　　　In  Jackson's  state  habeas  proceeding,  his  trial  counsel
submitted  an  affidavit  in  which  he  stated:

> During  punishment,  the  jury  knew  that  Jackson  had  been  in
> prison  for  10  years  and  our  main  strategy  was  to
> establish  that  he  was  a  good  candidate  for  a  life
> sentence  and  that  he  did  well  in  prison.   We  did  not  call
> employees  who  worked  with  [Jackson]  at  the  Luxeford  Hotel
> because  [Jackson]  was  working  there  at  the  time  of  the
> offense.   Witnesses  who  knew  [Jackson]  during  the  ten-

15

year period from the offense to the trial would have been in a Catch-22 type of position.  If they testified about the defendant's good character, they would be confronted with cross-examination that they didn't know [Jackson] very well because they did not know that he committed the offense ten years before trial.  We presented evidence of [Jackson]'s family background, his good behavior in prison and his psychological profile.  Also, we contacted everyone that the defendant wanted us to contact about punishment.

SH. at 250-51.[4]

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Wiggins v. Smith, 539 U.S. 510, 521 (2003) (internal quotation marks and alteration omitted) (quoting Strickland, 466 U.S. at 690-91).  When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  Id. at 527.  To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.  See United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).

_____

[4] "SH." refers to the transcript of Jackson's state habeas corpus proceeding.

16

The jury determining Jackson's punishment was the same jury that had just found beyond a reasonable doubt that Jackson was guilty of a double murder.  Testimony from friends and relatives that Jackson is nonviolent and that they did not believe he could commit such a crime would not have been convincing to that jury. Rather than present evidence counsel believed would not be credible, counsel chose to attack the future dangerousness special issue another way: by making the case that Jackson functioned well in a structured environment, such as prison, and would therefore pose no threat of future violence while serving a life sentence. In support of this theory, counsel called both a psychologist and a barber who taught Jackson in a prison vocational program. Counsel also presented evidence of Jackson's family background and upbringing.  In light of the reasonably anticipated credibility problems of Jackson's coworkers and others who knew him during the 10 year interval between the murders and Jackson's trial, counsel's trial sentencing strategy was entirely reasonable.

Moreover, even if counsel's decision not further to investigate these witnesses was not reasonable, Jackson suffered no prejudice.  In the context of a capital sentencing hearing, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.  "A reasonable probability is

a probability sufficient to undermine confidence in the outcome." Id. at 694.  As the Fifth Circuit succinctly framed this concept: "Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that . . . death was not an appropriate sentence?" Neal v. Puckett, 239 F.3d 683, 692 (5th Cir. 2001).  Because evidence that Jackson is nonviolent and mild mannered is in such direct contradiction to what the jury had already unanimously found beyond a reasonable doubt, namely that Jackson had bludgeoned and knifed two men to death, the testimony of these character witnesses is not "so compelling that there is a reasonable probability at least one juror could reasonably have determined that . . . death was not an appropriate sentence." Id.  Therefore, Jackson is not entitled to relief on this claim.

### 3.   Due Process

In his third claim for relief, Jackson argues that the Supreme Court's decisions in Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000), render the statutory special issues in his case violative of due process.  In Apprendi, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.  The Supreme Court extended the Apprendi holding to capital

18

cases in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002).  Jackson argues that the Texas mitigation special issue violates <u>Apprendi</u> by placing the burden of proving the existence of mitigating evidence on the defendant rather than requiring the State to prove the absence of mitigating evidence.

Application of the <u>Apprendi</u> rule is barred by the non-retroactivity rule of <u>Teague v. Lane</u>, 489 U.S. 288 (1989) (plurality opinion).[5]  In <u>Teague</u>, the Supreme Court held that a federal habeas court cannot retroactively apply a new rule of criminal procedure.  The Court explained that

> a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.  To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

<u>Id.</u> at 301 (emphasis in original).  The AEDPA effectively codified the <u>Teague</u> non-retroactivity rule "such that federal habeas courts must deny relief that is contingent upon a rule of law not clearly

---

[5] Respondent contends that this claim is procedurally defaulted, and Petitioner in his Response concedes as much, explaining that "<u>Apprendi</u> and <u>King</u> were not decided until after [Petitioner's] state writ application was filed."  Nonetheless, because relief on Petitioner's claim is so clearly barred by the non-retroactivity rule of <u>Teague v. Lane</u>, it is unnecessary to address Respondent's procedural default argument.  *See* <u>Lambrix v. Singletary</u>, 520 U.S. 518, 523 (1997) ("[j]udicial economy might counsel giving the <u>Teague</u> question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law").

established at the time the conviction becomes final." <u>Peterson v.</u> <u>Cain</u>, 302 F.3d 508, 511 (5th Cir. 2002), *cert. denied*, 537 U.S. 1118 (2003) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 380-81 (2000)).  In <u>Schriro v. Summerlin</u>, 542 U.S. 348, 355-58 (2004), the Supreme Court held that <u>Ring</u> does not apply retroactively.

The Texas Court Of Criminal Appeals denied Jackson's direct appeal on May 17, 2000.  *See* <u>Jackson v. State</u>, 17 S.W.3d 664 (Tex.Crim.App. 2000).  It appears that Jackson did not petition the Supreme Court of the United States for *certiorari*.  Therefore, his conviction became final for purposes of retroactivity analysis on August 15, 2000.  *See* Sup. Ct. R. 13.  <u>Ring</u> was not decided until 2004.  Therefore, Jackson's <u>Ring</u> claim is <u>Teague</u>-barred, and Jackson is not entitled to relief on this claim.

In any event, <u>Apprendi</u> itself rejects Jackson's position.

> Finally, the principal dissent ignores the distinction the Court has often recognized, *see*, *e.g.*, <u>Martin v. Ohio</u>, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), between facts in aggravation of punishment and facts in mitigation. . . .  If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.  Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

Apprendi, 530 U.S. at 491 n.16.  The Supreme Court has thus drawn a critical distinction between aggravating and mitigating circumstances in sentencing proceedings.  To the extent that some aggravating circumstance is required before the court may exceed an otherwise-prescribed sentencing range, the State must prove those aggravating circumstances beyond a reasonable doubt.  Under the Texas capital sentencing statute, the statutory maximum sentence in the absence of proof of aggravating circumstances is life imprisonment.  A court cannot sentence a defendant to death unless the State proves beyond a reasonable doubt that there is a probability that the defendant will commit future acts of violence constituting a continuing threat to society, and that he acted with the requisite mental state.  The jury, which was properly instructed on these issues, unanimously answered "yes" beyond a reasonable doubt on both of these questions.  Once the State has proven these two factors, the defendant may be sentenced to death.

The sentencing scheme, however, gives a defendant another opportunity to show that death should not be imposed, even though the State has met its burden of proof.  The mitigation special issue is, in this sense, analogous to an affirmative defense. Apprendi does not prohibit placing the burden of proof on this special issue on the defendant.  This special issue does not address a factor necessary to increase the maximum sentence; rather, it addresses factors that allow the jury to impose a

sentence *less than* the statutory maximum.  "[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." Rowell v. Dretke, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 126 S. Ct. 103 (2005). Accordingly, Jackson is not entitled to relief on this claim.

### 4.   10-12 Rule

In his fourth claim for relief, Petitioner argues that Tex.Crim.Pro. art. 37.071, which requires an instruction informing the jury that it must have at least 10 "no" votes to answer "no" on the aggravating special issues, and at least 10 "yes" votes to answer the mitigation special issue "yes," violates the Eighth Amendment. Petitioner argues that this misleads the individual jurors into thinking that they cannot return a life sentence unless at least ten jurors agree on an answer to the special issue.  In fact, the failure to agree unanimously on a "yes" answer to the aggravating special issues or on a "no" answer to the mitigation special issue would result in a life sentence.

In Mills v. Maryland, 486 U.S. 367 (1988) and McKoy v. North Carolina, 494 U.S. 433 (1990), the Supreme Court held that capital sentencing schemes requiring the jury unanimously to find the existence of any mitigating factor before giving that factor any weight violated the Eighth Amendment.  Rather, the Court held, each juror must be free to give any mitigating evidence any weight that

juror deems appropriate in weighing mitigating evidence against aggravating evidence.  *See* <u>McKoy</u>, 494 U.S. at 442-43.

The Fifth Circuit has rejected the claim that the 10-12 rule violates the Eighth Amendment under <u>Mills</u> and <u>McKoy</u>.  "<u>Mills</u> is not applicable to the capital sentencing scheme in Texas.  We have concluded that '[u]nder the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.'"  <u>Miller v. Johnson</u>, 200 F.3d 274, 288-89 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000)(quoting <u>Jacobs v. Scott</u>, 31 F.3d 1319, 1329 (5th Cir. 1994)).

While the trial court in this case informed the jury that it could not affirmatively find that there was a sufficient circumstance or circumstances to warrant a life sentence unless at least ten jurors agreed, it never instructed the jury that any particular number of jurors had to agree that any particular piece of evidence was mitigating.  Indeed, the jury was specifically instructed, "You need not agree on what particular evidence supports an affirmative finding on Special Issue No. 3."  In other words, even if only one juror felt that a specific piece of evidence was mitigating, that juror could give the evidence any weight deemed appropriate by that juror.  Thus, the instruction was that any ten jurors, individually weighing various mitigating evidence, could agree that there was a sufficient mitigating

23

circumstance or circumstances to warrant a life sentence.   This instruction does not suffer from the constitutional flaw underlying <u>Mills</u> and <u>McKoy</u>.

Jackson concedes that this claim is barred by the Fifth Circuit's holding in <u>Miller</u>, but asks that this Court to revisit the issue.   This Court, however, is bound by Fifth Circuit precedent.   Therefore, Petitioner is not entitled to relief.

5.   <u>Burden Of Proof</u>

The jury instructions stated:  "Your sole duty is to determine the guilt or innocence of the defendant under the indictment in this cause and restrict your deliberations solely to the issue of the guilt or innocence of the defendant."   In his fifth claim for relief, Jackson argues that the reference to guilt *or innocence* unconstitutionally placed the burden on Jackson of proving his innocence.

Jackson did not object to the jury instruction at trial.   The state habeas court found that his failure to raise a contemporaneous objection constituted a procedural default of this claim.   SH. at 286.

To preserve a claim for federal review, a defendant must make a specific and timely objection at the time of the allegedly objectionable conduct.   <u>Wainwright v. Sykes</u>, 433 U.S. 72, 86-87 (1977); <u>Hughes v. Johnson</u>, 191 F.3d 607, 614 (5th Cir. 1999) (Texas

applies its contemporaneous objection rule 'strictly and regularly' and . . . it is an 'independent and adequate state-law procedural ground sufficient to bar federal court habeas review of federal claims'") (quoting Amos v. Scott, 61 F.3d 333, 345 (5th Cir. 1995)), cert. denied, 528 U.S. 1145 (2000).   Failure to object constitutes a procedural default, which bars federal habeas review unless the petitioner shows cause for the default, and actual prejudice flowing from the alleged constitutional violation, or a miscarriage of justice.  Sykes, 433 U.S. at 87, 80.

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule, or a showing of a prior determination of ineffective assistance of counsel.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Amadeo v. Zant, 486 U.S. 214, 222 (1988).  Jackson offers no showing of cause for his procedural default.  Therefore, this court may not review this claim unless failure to do so would constitute a fundamental miscarriage of justice.

A "miscarriage of justice" means actual innocence.  Sawyer v. Whitley, 505 U.S. 333, 335 (1992).  To show actual innocence, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" if not for the alleged error.  Schlup v. Delo, 513 U.S. 298, 327 (1995).

Petitioner does not argue that he is actually innocent.  While he does argue that the evidence was constitutionally insufficient to support his conviction, that claim fails for the reasons discussed above.  Accordingly, Jackson's claim that the jury instruction unconstitutionally shifted the burden of proof is procedurally defaulted.

## III.  Certificate of Appealability

Jackson has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See* Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.")  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See* Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); *see also* Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting

26

appellate review to those issues alone." <u>Lackey v. Johnson</u>, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* <u>United States v. Kimler</u>, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." <u>Hernandez v. Johnson</u>, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

<u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). "The nature of the penalty in a capital case is a 'proper consideration in determining

27

whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" Washington v. Johnson, 90 F.3d 945, 949 (5th Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully and exhaustively considered each of Jackson's claims.  While the issues Jackson raises are clearly important and deserving of the closest scrutiny, the Court finds that each of the claims is foreclosed by clear, binding precedent. This Court concludes that under such precedents, Jackson has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As to the claims that have been dismissed on procedural grounds, this Court concludes that jurists of reason would not find it debatable whether the petition states valid grounds for relief and would not find it debatable whether this Court is correct in its procedural determinations.  This Court concludes that Jackson is not entitled to a certificate of appealability on his claims.

IV.  <u>Order</u>

For the foregoing reasons, it is ORDERED as follows:

1.    Respondent Nathaniel Quarterman's Motion for Summary
      Judgment (Document No. 4) is GRANTED;

2.    Petitioner Derrick Leon Jackson's Petition for Writ of
      Habeas Corpus (Document No. 1) is in all respects DENIED,
      and Jackson's Petition is DISMISSED WITH PREJUDICE;

3.    No Certificate of Appealability shall issue in this case.

The Clerk shall notify all parties and provide them with a
true copy of this Order.

SIGNED at Houston, Texas, on this 12th day of February, 2007.


                          _____
                               EWING WERLEIN, JR.
                          UNITED STATES DISTRICT JUDGE